## United States Bankruptcy Court, Northern District of Illinois

| Name of Assigned Judge | Manuel Barbosa | CASE NO. | 08-B-13738 |
|---|---|---|---|
| DATE | March 25, 2011 | ADVERSARY NO. | 09-A-01193 |
| CASE TITLE | Shawn M. Hunter, Debtor<br><br>Charles J. Myler, Trustee, Plaintiff<br><br>v.<br><br>Main Street Partnership, LLC,<br>Frederick B. Norris, and<br>Randy Matz, Defendants. | | |

**DOCKET ENTRY TEXT**

For the reasons set forth below, judgment is entered in favor of Defendant Frederick Norris.

■[ For further details see text below.]

## MEMORANDUM DECISION

The Trustee alleges that one or more of the Defendants confiscated restaurant equipment and wine owned by the Debtor, and seeks to avoid the transfer as either a pre-petition preferential transfer or as a post-petition transfer in violation of the automatic stay. Default was entered against Randy Matz on May 21, 2010. Main Street Partnership filed its own bankruptcy under Chapter 11 on April 13, 2010, which was converted to Chapter 7 on July 29, 2010, and the Plaintiff indicated on December 23, 2010, that he had not sought to lift the automatic stay in Main Street's case, and did not wish to continue the adversary as against Main Street, but

might file a claim in Main Street's bankruptcy case. The Court will deem such statement as an oral motion to voluntarily dismiss the adversary against Main Street without prejudice. A trial was held on December 23, 2010, to determine the liability of Mr. Norris. Because the Trustee failed to prove that any property was transferred by, to or for the benefit of Mr. Norris, judgment will be entered in favor of Mr. Norris.

The Debtor owned and operated a restaurant known as "Hunters" in St. Charles, IL, until early 2008. He rented the property on which the restaurant was located from Defendant Main Street Partnership, LLC, which is jointly owned by Co-Defendants Randy Matz and Fred Norris. The Debtor opened Hunters in December 2006, but ran into financial difficulty by early 2008. By March 2008, he owed between $54,000 and $57,000 in back rent to the Defendants. Hunters stopped operating sometime in mid- to late-March 2008. The Defendants filed an action for forcible entry and detainer against the Debtor in April 2008, and were granted immediate possession of the premises on April 16, 2008. Until that date, the Debtor had full access to the property, and the April 16th order gave him an additional 7 days to remove his personal property from the building. The Debtor filed a petition for protection under Chapter 7 of the Bankruptcy Code with this Court on May 29, 2008.

The Debtor claims that when he vacated the premises in April 2008 he left behind 1,500 bottles of wine in a locked room in the cellar and extensive cooking equipment, including a convection oven, an eight-burner stove, a deep fryer, stainless steel sinks, refrigerators, freezers, a dishwasher, tables, chairs, an ice machine, and cabinets. He claims that all of the wine is now gone as well as the equipment, or at least all of the equipment not attached to the walls.[1] For each item that was allegedly removed from the building, there are four possibilities: 1. one of the Defendants removed it, 2. Mr. Hunter removed it, 3. someone else removed it, or 4. it never existed. The Trustee offered no proof that any of the Defendants removed the property, other than that they would have had access to the building at the time it 'disappeared,' and the Court finds the other explanations more plausible.

The Debtor had weeks after he shut down his restaurant and before he filed his bankruptcy petition to remove his valuable property. People who voluntarily file petitions for bankruptcy are normally in financial distress, and the Court believes that people who are in financial distress do not normally just leave valuable and easily movable assets, such as hundred-dollar bottles of wine, lying around on property they abandon – especially where they are not suffering medical problems or other obstacles to removing such property. The Debtor claimed that he did not remove the equipment or inventory because he was hopeful that he could sell the restaurant and was told "it would be better to sell it with the stuff in the restaurant." (Trial Tr. 42:2-10). That might explain why he delayed moving items, but surely by the time the state court entered an order giving the Defendants immediate possession of the building and granting him only 7 days to remove his property, he could no longer have had hopes of selling the restaurant as a going concern. Moreover, Mr. Norris, who worked next door to the restaurant, testified that he had seen Mr. Hunter and several people working for him removing boxes of items for several weeks before the detainer order, and during the seven days afterwards. (Trial Tr. 71:7-17).

---

[1] As discussed below, there was painfully little testimony or evidence presented as to what specific pieces of equipment were still on the premises. At one point, the Trustee testified that the Debtor had told him the current tenant was "apparently, using the equipment," but did not clarify which equipment was still present. (Trial Tr. 16:11-14). At a later point, Mr. Norris testified that a sink attached to the wall was still there (Trial Tr. 73: 20-24), and generally stated that "the equipment which [the Debtor] could not remove without damaging the wall" was still there. (Trial Tr. 77: 11-16).

Mr. Hunter denied this, but Mr. Norris's testimony was far more plausible under the circumstances. There was no evidence presented that the Defendants filed a distress warrant or attempted to levy against or otherwise collect against Mr. Hunter's property. See, 735 Ill. Comp. Stat. 5/9-302, 303. Given the fact that the Defendants apparently went through proper legal channels in evicting Mr. Hunter, the Court is skeptical that they would have simply taken his personal property without similarly complying with law, as the Trustee seems to allege. In contrast, Mr. Hunter was free to remove his property, and even after eviction sought and received numerous court orders allowing him access to remove property that he claimed he had left behind.

Moreover, particularly with respect to the wine, the Court is skeptical that all "1,500 bottles" of wine ever existed or were still on the premises at the time Mr. Hunter left in April 2008. First, Mr. Hunter admitted that 1,500 was only an "approximate figure." (Trial Tr. 48:2). He did not state how he came up with the number, and admitted that he no longer had access to his business records to confirm the number. (Trial Tr. 48:2-8). His only written evidence was an undated wine menu from the restaurant, listing around 100 different wines. This might support the argument that the restaurant had at least one bottle of each of those wines at one time, but not that they were still there when he vacated the premises. The menu itself noted that "some wines as well as vintages may not be available due to supply." (Pl.'s Ex. C). Nor was there any indication as to how often the wine menu was updated. While it was perhaps an indication of the restaurant's wine stock in ordinary times, it is highly likely that the stock decreased during the final months of the restaurant's operation, when it was in financial distress. The Court feels that Mr. Hunter's unsupported estimate of the bottles of wine was likely an overestimate and based on the peak inventory of wine. Mr. Norris testified that towards the time the restaurant stopped operating, Mr. Hunter prominently advertised a sale on wine, including an offer of half-off certain bottles of wine. (Trial Tr. 68:20-25, 69:1-16). This would seem to indicate he was trying to liquidate his inventory, which would be expected for a restaurant in financial distress. Additionally, if Mr. Hunter was unable to continue paying his rent, it is also likely that he was not replenishing or increasing his inventory of wine. Therefore, even if the stock of wine was at one point 1,500 bottles, it is likely that by the time Hunters shut its doors in late March, the inventory of wine had substantially decreased. Moreover, the Court is highly skeptical that Mr. Hunter would have left any of the remaining bottles, which were likely one of his most liquid and easily moveable assets, at the restaurant for the remaining two months before he filed for bankruptcy, particularly since the evidence showed he had full access to the wine cellar at least until the end of April.

The Trustee relies entirely on the testimony of the Debtor that the bottles of wine and equipment existed and were still on the premises when he vacated the building. And yet, the Debtor did not list any of the wine or equipment in his original bankruptcy schedules, which he signed under penalty of perjury. He did subsequently file an amended Schedule B on August 30, 2008, in which he listed the restaurant equipment, which he valued at only $15,000, but even the amended schedule made no mention of the wine.[2] Mr. Hunter explained that he did not originally list the equipment because he thought it was owned by his daughter and was therefore not property of his estate. Apparently, he 'borrowed' money from his daughter's college fund to purchase the equipment at the time he opened the restaurant, and promised to "pay her back on a monthly basis" by entering into a lease agreement with her. (Trial Tr. 29:17-25). He stated that he filed the amended schedules after learning that the lease arrangement was invalid because his daughter was still a minor at the time of the

---

[2] The amended Schedule B was never separately filed, but was only filed as an exhibit to a motion to reopen the bankruptcy case.

transaction, and he therefore had come to believe that the equipment was part of his estate. (Trial Tr. 31:10-25, 32:1-4).[3] But this explanation would not explain why he failed to list the alleged bottles of wine in his original schedules or the amended schedule. If he believed the wine was still in the cellar, it seems he would have listed it as an asset, and if he believed the Defendants had wrongfully confiscated it, it seems he would have listed a claim against them as an asset. In contrast, the omission is consistent with Mr. Hunter already having disposed of the wine before his petition date.

As for the equipment, Mr. Norris testified that Mr. Hunter removed all equipment that was not attached to the building, and the evidence showed that he had ample time and opportunity to do so. Not only did he have access to the property until April 16, 2008, the April 16th order gave him an additional 7 days to remove his property, and at least six times over the following eighteen months, Mr. Hunter sought and obtained court orders granting him access to collect personal property, (Trial Tr. 78:5-12), most of which consisted of personal items, such as CDs, umbrellas, stools and other items of limited value. (Trial Tr. 77:17-23). Mr. Norris testified that he complied with each of those orders. He testified that in compliance with one order, he personally delivered a "Styrofoam cup, butane .... heating element, a wire basket ... garbage cans ... two Crock-Pots, [an] Aluminum pot [and] a hotdog steamer." (Trial Tr. 85: 14-24). Mr. Norris testified that in connection with other court orders Mr. Hunter was granted a police escort while he was given access to the premises, (Trial Tr. 76: 8-12), and that Mr. Hunter loaded various items onto a truck and left with them. (Trial Tr. 78:13-19). The Trustee failed to present any evidence showing that the Defendants removed any property other than to deliver it to the Debtor. The Trustee did not specifically identify any moveable property that was still in the possession of the Defendants. Mr. Norris did testify that there was some equipment that was still attached to the building, but the Trustee did not demonstrate that it was estate property, as opposed to having been incorporated into the building owned by the Defendants when it was attached to the building in late 2006. The parties did not provide a copy of the lease agreement or provide testimony as to how it treated fixtures. Cf. Southwest Bank v. Poulokefalos, 401 Ill. App. 3d 884, 931 N.E.2d 285 (Ill. App. Ct. 2010) (lease agreement provided that "all alterations, additions, floor covering and carpeting thereto and all decorations, fixtures, furnishings, partitions, heating, ventilating and cooling equipment and other equipment, which are permanently affixed to the Premises, which (if not then the property of the Landlord) shall thereupon become the property of Landlord without any payment to tenant [ ]."). However, even in the absence of an express contractual provision, under Illinois law trade fixtures attached by a tenant to the realty may only be removed by the tenant at the expiration of the lease "if, after the fixture is removed, the realty is the same as it was prior to the tenant's tenancy." Nokomis Quarry Co. v. Dietl, 333 Ill. App. 3d 480, 484, 775 N.E.2d 669, 673 (Ill. App. Ct. 2002). The only testimony about equipment still on the premise was Mr. Norris's testimony about a three-basin sink, which he stated "would leave a big hole in my wall [if removed] and that wouldn't be good," (Trial Tr. 74:4-5) and a general statement by Mr. Norris that the only equipment remaining on the premises was "the equipment which [Mr. Hunter] could not remove without damaging the wall." (Trial Tr. 77:9-16). Therefore, the evidence

---

[3] The Defendants rely heavily on these facts, arguing that the equipment was in fact owned by Mr. Hunter's daughter, since the lease was only "voidable" not "void." The Court need not address that argument, nor related arguments such as whether the so-called 'lease' was a financing rather than true lease, since even if the equipment was property of Mr. Hunter's estate, the Trustee did not demonstrate it was ever transferred to the Defendants (other than, as discussed below, any equipment incorporated into the building, and the Trustee has not argued any such incorporation occurred within the 90-day preference period or was a fraudulent transfer).

shows that all movable equipment was removed by or on behalf of Mr. Hunter, not the Defendants, and the remaining equipment became incorporated into the building when attached thereto, and therefore was not property of the Debtor.

Therefore, the Trustee failed to demonstrate that any property of the estate or property of the Debtor was transferred to the Defendants, either prepetition or post-petition. For the foregoing reasons, judgment will be entered in favor of Defendant Fred Norris.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

March 25, 2011

/s/ Manuel Barbosa
Judge Manuel Barbosa